FILED

2017 Mar-20  PM 01:28
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF LABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| ANITA DAVIS, | ) | |
| | ) | |
| CLAIMANT, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 2:15-CV-1429-KOB |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| ACTING COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| RESPONDENT. | ) | |
| | ) | |

MEMORANDUM OPINION

I. INTRODUCTION

On July 12, 2012, the claimant, Anita Davis, protectively applied for disability

benefits under Titles II and XVI of the Social Security Act. (R. 132-147). The claimant

alleged disability beginning on June 7, 2012, because of chronic moderately severe hip

and back pain. (R. 33, 50). The Commissioner denied the claims on September 7, 2012.

The claimant filed a timely request for a hearing before an Administrative Law Judge,

and the ALJ held a video hearing on November 30, 2013. (R. 27-49).

In a decision dated January 23, 2014, the ALJ found that the claimant was not

disabled as defined by the Social Security Act and was, therefore, ineligible for social

security benefits. (R. 11-20). On June 21, 2015, the Appeals Council denied the

claimant's requests for review. (R. 1-5). Consequently, the ALJ's decision became the

final decision of the Commissioner of the Social Security Administration. The claimant

1

has exhausted her administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§405(g) and 1383(c)(3). For the reasons stated below, this court reverses and remands the decision of the Commissioner.

## II. ISSUE PRESENTED

Whether the ALJ erred in evaluating the claimant's allegations of the limiting effects of her symptoms because substantial evidence does not support her findings regarding the claimant's need for a cane and her ability to frequently balance, stoop, kneel, crouch, crawl, and climb stairs.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the ALJ's decision if she applied the correct legal standards and if substantial evidence supports her factual conclusions. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No…presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 402 (1971).

The court must keep in mind that opinions, such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors, "are not medical opinions,…but are, instead, opinions on issues

reserved to the Commissioner because they are administrative findings that are

dispositive of a case; i.e., that would direct the determination or decision of disability."

20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets a Listing and is

qualified for Social Security disability benefits is a question reserved for the ALJ, and the

court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for

that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).

Thus, even if the court were to disagree with the ALJ about the significance of certain

facts, the court has no power to reverse that finding as long as substantial evidence in the

record supports it.

The court must "scrutinize the record in its entirety to determine the

reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A

reviewing court must not only look to those parts of the record that support the decision

of the ALJ, but also must view the record in its entirety and take account of evidence that

detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180

(11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when

the person is unable to "engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not less

than 12 months…." 42 U.S.C. § 423(d)(1)(A). To make this determination the

Commissioner employs a five-step, sequential evaluation process:

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?

3

(3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
(4) Is the person unable to perform his or her former occupation?
(5) Is the person unable to perform any other work within the economy?

An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520, 416.920.

## V. FACTS

The claimant was fifty-four years old at the time of the ALJ's final decision (R. 29); has a high school education (R. 73); has past relevant work as a bus attendant, sewing machine operator, sales clerk, and day care worker (R. 45); and alleges disability based on chronic moderately severe hip and back pain (R. 33, 50).

### Physical Impairments

The claimant sought treatment on April 6, 2010 with Dr. Joshua Miller at Cooper Green Health Center, complaining of lower back pain that radiated into her left leg and calf.  She reported to Dr. Miller that the Ultram and Parafon Forte that she was taking for pain was not working.  He prescribed 500 mg of Naproxen and Tylenol 3 for pain and ordered an MRI of her lumbar spine.  The claimant underwent an MRI of her lumbar spine on May 11, 2010 that showed shallow lordosis or curvature of the spine; normal disc heights with no gross desiccation; no disc bulge or herniation; a well-preserved central canal; "mild ligamentous hypertrophy at the lower of two levels with earliest of facet changes resulting [in] mild foraminal compromise bilaterally"; and otherwise unremarkable findings considering the claimant's age.  (R. 316, 332).

4

On June 8, 2010, the claimant returned to Dr. Miller complaining of back pain. Dr. Miller noted that the claimant was involved in a car accident in 2006 and that litigation was pending based on that accident.  Regarding whether the pending litigation contributed to the claimant's complaints of continued pain, he noted "? factor in lack of improvement."  Dr. Miller noted the findings on the MRI the previous month and referred the claimant to physical therapy.  (R. 269).

The claimant began physical therapy at Cooper Green on June 28, 2010, and returned on July 9, 16, and 30.  On July 9, she reported constant pain and numbness in her lower extremities, but the therapist reported that "despite constant complaints of pain/numbness, [the claimant] tolerate[d] exercises with no signs of discomfort."  The claimant stated on July 16 that she had "on and off days with pain," but she again tolerated the session with no complaints of pain or discomfort.  On July 30, the claimant reported that she continued to do her exercise at home, but she continued to experience pain and had swelling in her ankles.  The therapist noted that the claimant had reached the "maximum benefit" of physical therapy; encouraged her to continue her maintenance program at home; and discharged her from physical therapy.  (R. 264-267).

In a physical therapy evaluation form dated September 21, 2010, the therapist reported that the claimant reported improvement in her pain, but listed her pain level as a "7/10" on the pain scale.  The therapist also noted that the claimant had weakened strength of "4/5" in her lower extremities; had difficulty with her "household activities" and "standing activities"; was able to tolerate prolonged standing and walking with some pain; could participate in her activities of daily living; and should continue her maintenance program at home.  (R. 268).

On September 21, 2010, the claimant returned to Dr. Miller complaining of constant pain in her back and legs when standing and swelling in both feet and ankles. Dr. Miller noted that the claimant completed physical therapy and was to complete a home exercise program.  He continued the claimant's prescriptions for Trazadone for insomnia and Parafon Forte, Tylenol 3 and Naproxen for pain.  (R. 262).

The claimant saw Dr. Bruce Pava at Cooper Green Medical Center on November 9, 2010 complaining of a shooting pain in her left hand that radiated to her left upper extremity.  Dr. Pava's impression was "probable neuropathy," and he prescribed the claimant Neurontin.  (R. 323).

Almost four months later, the claimant returned to the Cooper Green Medical Center and saw Dr. James Floyd on March 7, 2011, complaining of hip and back pain. Dr. Floyd noted both the car accident in 2006 and the MRI of her lumbar spine in 2010. He also noted that the claimant had not taken her medications for two months, but the records do no indicate the reason.  X-rays of her hips showed normal bone and joint structures; no soft tissue calcification; and no significant swelling.  Dr. Floyd referred the claimant back to Dr. Miller for a fibromyalgia assessment.  (R. 255, 313).

The claimant returned to Dr. Miller on March 31, 2011 for a routine visit.  Dr. Miller noted the claimant's chronic pain with an unknown origin; her insomnia; and her hip x-rays from March 7 that were normal.  His orders included a lab work for a rheumatoid analysis for fibromyalgia, but the results are not in the record.[1]

---

[1]   Dr. Jamie Bell at Cooper Green noted during a July 5, 2012 examination of the claimant that her "RF AND ANA" tests were "NEGATIVE 3/2011."  (R. 293). However, the court can find no medical records showing the results of those tests.

The record contains no medical reports for the claimant from March 31, 2011 to June 7, 2012, when she sought treatment at the Emergency Room at Cooper Green Hospital.  The claimant reported a sharp, aching pain in her lower back, legs, and chest that was worse with movement and better with rest.  She assessed her pain as a "7/10" on the pain scale.  Dr. Raymond Broughton noted that she had "generalized joint pain" tender on palpation; "mild stiffness" at times; no joint swelling; tenderness in her neck with manipulation; normal range of motion in her lower extremities; tenderness with bending or sitting for long periods of time; a normal gait; and no active medications.  Dr. Broughton ordered an x-ray of the claimant's lumbar spine that showed no significant abnormalities; well-maintained displaces; and an otherwise unremarkable vertebra. Broughton's clinical impression was arthralgias or joint pain that was stable at the time of discharge.  He noted that the claimant had "LUMBAR SPINE SEVERE DJD" and ordered her to use warm moist heat on her lower back; to avoid heavy lifting; and to not drive or operate heavy machinery.  Dr. Broughton prescribed Prednisone for any inflammation and Tramadol, Mobic, and Robaxin for pain and told her to take the medications as prescribed.  (R. 240-241,295-299, 307).

The claimant returned to Cooper Green Clinic on July 5, 2012 complaining of low back and hip pain at a "7/10" on the pain scale.  She reported  to Dr. Jamie Bell that in June Dr. Broughton told her that her discs are "separating" and that she has "arthritis in [her] spine" and a "high case of inflammation."  The claimant reported that her medications include Methocarbamol, Naproxen, Tramadol, Trazadone, and Meloxicam, but that nothing helped her pain.  She told Dr. Jamie Bell that she "is planning to file for disability."

Dr. Bell noted that the claimant ambulated with a cane and reported chronic pain in her lower back and hips.  During the physical examination, Dr. Bell noted that the claimant "moves all extremities well"; had a negative bilateral straight leg test; and had passive range of motion in her hips without pain.  Dr. Bell ordered an x-ray of the claimant's hip that showed a slight widening of symphysis but no fracture deformity. He also noted that her rheumatoid factor (RF) and antinuclear antibody (ANA) tests from March 2011 were negative.  He prescribed the claimant Naproxen, Robaxin and Ultram and discontinued her prescription for Mobic and Meloxicam.  (R. 289-294).

An MRI on July 24, 2012 revealed the early stages of degenerative disc disease; no focal disc protrusion or herniation; no central stenosis; and "neural foraminal compromise" in the lower two levels.  (R. 303).  On August 31, 2012, the claimant underwent an MRI of her hips that showed well-maintained joint spaces with no effusion; unremarkable musculature and subcutaneous fat; and otherwise negative results.  (R. 245).

At the request of the Social Security Administration, the claimant completed a "Function Report-Adult" on July 30, 2012.  In that report, the claimant stated that, on a typical day, she takes a shower; straightens her bed if she is not hurting; reads; watches television; talks to family members sometimes; cooks dinner about twice a week; crotchets a little sometimes; and lays down to go to bed.  She has trouble sleeping because of pain in her back, spine, and hips.  She can do most personal care activities by herself, but she needs the assistance of a cane to use the toilet; can do laundry and iron a little every day with help; can clean the house with help; goes outside five to six days a week; shops for food once a week for thirty minutes to an hour; can sew a little but it

bothers her back and causes her feet and ankles to swell; and goes to church.  (R. 191-195).

In the Function Report, the claimant also indicated that she cannot squat, bend, reach or kneel; that she hurts if she stands or walks too long or climbs stairs; and that she cannot complete tasks or concentrate if she is hurting.  She can walk about forty to fifty feet before she needs to stop and rest for about ten minutes; can pay attention about one hour at a time; can follow written and spoken instructions well; and handles stress well. She indicated that she walks with a cane "daily," and that a doctor prescribed the cane.

On October 30, 2012, Nurse Practitioner Annie McCartney with Cooper Green Mercy Hospital noted the claimant's DEXA or bone density test showed a new diagnosis of osteoporosis.  Ms. McCartney prescribed Fosamax and instructed the claimant to eat a calcium-rich diet; to exercise "3 min X 3/week"; and to have another DEXA test in two years.  The claimant rejected hormone therapy with estrogen because of the risks.  (R. 364).

During an examination at Cooper Green Mercy Hospital on December 21, 2012 for the flu, Dr. Jacqueline Duke noted that the claimant had "Normal ROM," but did not identify any specific parts of the body.

The claimant did not seek medical treatment for her back or hip pain again until May 17, 2013, when she returned to Cooper Green Mercy Hospital for a follow-up appointment regarding her Fosamax use.  The claimant stated that she tolerated the medication well, but noted that she had "significant left hip and left knee pain."  Dr. Rowell Ashford referred the claimant to an orthopedic doctor.  (R. 357).

A week prior to her orthopedic appointment, the claimant returned to the Urgent Care Clinic at Cooper Green Mercy Hospital on July 1, 2013, complaining of a rash. During the physical examination, Nurse Practitioner LaFayette Holmes noted that the claimant has a normal range of motion in her extremities; has a normal gait; and was taking Methocarbamol for muscle spasms, Narpoxen and Tramadol for pain, and Trazodone to help her sleep. Ms. Holmes gave the claimant a steroid injection in her hip and prescribed a Prednisone taper for her rash. (R. 352-354).

The claimant presented to Dr. Lucas Routh, an orthopedic specialist at Cooper Green Mercy Hospital, on July 10, 2013 upon Dr. Ashford's referral. The claimant told Dr. Routh that she has pain in her left hip and knee that worsened when laying on her left side; that the pain comes and goes; that she has a sharp pain in her left knee that worsens when walking; that Naproxen gives her "mild relief"; and that she has not tried physical therapy lately. Upon examination of the claimant, Dr. Rough noted that the claimant ambulated with a cane; had an abnormal Trendelenberg gait when walking; had full range of motion in her left hip and knee; had no pain with a "logroll" of the hip; had a stable knee with "V/V stress"; and had 5/5 strength "throughout." (R. 348-349).

Dr. Routh ordered a left hip x-ray that revealed "mild superior joint space narrowing consistent with mild OA" and a left knee x-ray that showed "early degenerative changes of the medial compartment and patellofemoral joint." He assessed that the claimant has "left greater trochanteric bursitis" and mild osteoarthritis in her left hip and knee. He did not give her a steroid injection because of the steroid injection a week earlier; discontinued her prescription for Trazodone; continued her prescriptions for

Methocarbamol, Tramadol and Naproxen; and prescribed her Alendronate for osteoporosis.  Dr. Routh also referred the claimant to physical therapy.  (R. 349-350).

The claimant went for a physical therapy evaluation at Cooper Green Mercy Hospital on July 19, 2013.  Physical Therapist Herman Turner noted that the claimant reported difficulty with standing and walking activities; used a cane for mobility; reported walking in the park three times a week for exercise; and stated that she cannot continue physical therapy because of financial and transportation issues but would do the exercises at home. The claimant assessed her pain as a "7/10" on the pain scale and described it as "intermittent, variable, [and] daily."  Mr. Turner noted the claimant's "lower extremity weakness" and described the claimant's gait as "Mild Antalgic Pattern with Standard Cane."  Her range of motion in her lower extremities was "within functional limits."  He gave the claimant instructions about how to properly use her cane and therapeutic exercises to do at home.  (R. 346).

The claimant returned to Dr. Routh on August 21, 2013 for a follow-up examination complaining of severe left hip and knee pain.  The claimant reported that her pain worsens when she lays on her left side or stands too long; that her left knee pain has worsened and was now "popping, catching[,] and giving out"; and that she continues to ambulate with a cane.  Dr. Routh noted that the claimant requested a knee brace for "subjective knee instability" and that she stated her medications only give her "mild relief." During the physical examination of the claimant, Dr. Routh reported that her knee was "stable to v/v stress," but ordered an MRI of her left knee "given [the] worsening knee pain and mechanical instability."[2]  He told the claimant to return for follow-up at

---

[2]  The record does not contain the results of an MRI of her knee after this examination.

the clinic following the MRI and discussed steroid injections for the pain, but the claimant wanted to "think this over" because she has osteoporosis and "is concerned this will lead to its progression."  (R. 342-344).

A few weeks later on September 12, 2013 at her annual gynecological exam, Dr. Bell noted that the claimant ambulated with a cane and wore a left knee brace. The claimant complained of insomnia, so Dr. Bell re-instated her prescription for Trazadone. (R. 341).

*The ALJ Hearing*

At the hearing before the ALJ on November 30, 2013, the claimant testified that she lives with her husband in an apartment.  She last worked in June 2012 as a bus attendant lifting wheelchairs but had to stop working because of her pain.  The claimant stated that she received unemployment from June to July 2012, but when she told them about her disability, her benefits ended.  She receives food stamps and has no health insurance.  The claimant testified that she tried to get free or reduced services from Cooper Green, but she did not qualify because of the money her husband receives for his disability.  (R. 30-33, 38).

She described that on a typical day she gets up, takes a shower, and lays down for a "majority of the day."  Her husband fixes breakfast and brings it to her in bed. She sits in the living room to eat her dinner but then goes back to the bedroom to lie down.  She testified that she does drive "sometimes."  (R. 30-31).

When asked why she cannot work, the claimant stated that she cannot lift, pull, or bend because those activities affect her back and hips.  The ALJ asked the claimant about the fact that she used a cane at the hearing to ambulate and whether she has a doctor's

prescription for the cane.  The claimant said that "Dr. Bratton"[3] prescribed the cane, but her attorney could not find an actual medical prescription for the cane in the medical records.  She also stated that she requested a knee brace from her orthopedic doctor, Dr. Routh, to help with her balance in her left knee.  (R. 33-34).

The claimant testified that she walks thirty minutes or so in the house on and off during the day. She said she used to walk at the park around the trail but had to stop because the pain in her left hip worsened.  Her hips and lower back hurt when she stands too long; she needs to lie down between four and five hours in an eight hour work day; and she can sit thirty to forty minutes at a time and then needs to stand about ten minutes. She testified that she was in pain at the hearing from sitting.  (R. 35-37).

Regarding her medications, she testified that she takes Alendronate for her osteoarthritis, Naproxen for pain, and Robaxin for inflammation.  She stated that she takes her medication when she is has the funds to get it and that she has to "spread out" her mediations so she "can have something to take."  The last time she could afford her medications was June 2013 and she got thirty pills, and the last time she took her medications was in August 2013 because she had spread them out over time.  The claimant testified that she was "cautious" of steroid shots because she already has osteoporosis and does not want her bones to get "any weaker than what they are."  She does not take over the counter medications because she is concerned about her liver.  (R. 42-44).

---

[3]   The court can find no "Dr. Bratton" in the record. However, the claimant did seek treatment from a "Dr. Broughton" on June 7, 2012 at Cooper Green Hospital Emergency Room.  (R. 240-241, 295-299, 307).

A vocational expert, Dr. Uno,[4] testified concerning the type and availability of jobs that the claimant was able to perform. Dr. Uno testified that the claimant's past relevant work was as a bus attendant, classified as light, unskilled work; a day care worker, classified as light, semi-skilled work; a sewing machine operator, classified as light, unskilled work; and a sales clerk, classified as light, low-semi-skilled work. The ALJ asked Dr. Uno to assume a hypothetical individual the same age, education, and experience as the claimant with a residual functional capacity to perform light work who can frequently balance, stoop, kneel, crouch, crawl, and climb ramps or stairs; can never use ladders, ropes, or scaffolds; must avoid concentrated exposure to extreme cold and vibration; and can have no exposure to unprotected heights and hazardous machinery. Dr. Uno testified that individual could perform the claimant's past work. (R. 46-47).

In her second hypothetical, the ALJ asked Dr. Uno to assume all of the prior limitations except the individual must be allowed to alternate between standing and sitting every forty-five minutes to an hour while remaining on-task. Dr. Uno testified that individual could not perform the claimant's past work, but that individual could work as a cashier, classified as light work, with 67,200 jobs in Alabama and 3,314,000 jobs in the nation; an informational clerk, classified as light work, with 11,450 jobs in Alabama and 966,150 jobs in the nation; a small products assembler, classified as light work, with 1,820 jobs in Alabama and 218,740 jobs in the nation. (R. 46-47).

In her third hypothetical, the ALJ added an additional limitation that the individual could do only sedentary work and had to use a cane to ambulate. Dr. Uno testified that individual could not perform the claimant's past work and that the claimant

---

[4]  The record does not contain Dr. Uno's first name.

had not acquired any skills in her past work that would transfer to any jobs at the sedentary level.  (R. 48).

*The ALJ's Decision*

On January 23, 2014, the ALJ issued a decision finding that the claimant was not disabled under the Social Security Act. (R. 11-20). First, the ALJ found that the claimant met the insured status requirements of the Social Security Act through September 30, 2017, and had not engaged in substantial gainful activity since her alleged onset date of June 7, 2012.  (R. 13).

Next, the ALJ found that the claimant had the severe impairment of "left greater trochanteric bursitis."  However, she found that the claimant's degenerative disc disease, knee impairment, and osteoporosis were non-severe impairments.  She noted that the June 2012 x-ray of the claimant's lumbar spine showed no significant abnormality; that the May 2010 and July 2012 MRIs showed only early stages of degenerative disc disease; and that the claimant had negative straight leg raise tests, normal range of motion in her back, and tenderness in her back on only one occasion.  The ALJ also noted that the claimant's left knee x-ray showed only early degenerative changes; she only had mild tenderness on palpation, full range of motion, and full motor strength in her knees; her knee was stable to v/v stress; and her orthopedic noted the claimant requested a knee brace for subjective knee instability in August 2013.  Regarding the claimant's osteoporosis, the ALJ stated that the records do not show how that impairment limits her function and that the recommendation that she exercise shows no significant limitation.

The ALJ next found that the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed

impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 15).  The ALJ considered whether the claimant met the criteria for Listing 1.02 involving major dysfunction of a joint, but found that she did not have the gross anatomical deformity or chronic joint pain and stiffness or joint space narrowing to meet that Listing. (R. 15).

Next, the ALJ determined that the claimant has the residual functional capacity to perform light work, except that she can frequently balance, stoop, kneel, crouch, crawl, and climb ramps and stairs; never climb ladders, ropes, or scaffolds; must avoid concentrated exposure to extreme cold and vibration; and must avoid all exposure to unprotected heights and hazardous machinery.  (R. 15-16).

In making this finding, the ALJ considered the claimant's symptoms and corresponding medical record. The ALJ concluded that, although the claimant's medically determinable impairments could reasonably be expected to cause her symptoms, the claimant's allegations regarding the intensity, persistence, and limiting effects of those symptoms were not fully credible when compared with the evidence. Specifically, the ALJ found that the objective evidence does not support the debilitating level of pain and difficultly alleged by the claimant.  The ALJ noted the July 2012 hip x-rays and August 2012 MRI that showed no obvious fracture deformity and pointed out that the mild superior joint space narrowing did not manifest until the July 2013 x-ray. (R. 16-17).

The ALJ also found that the physical examinations did not show abnormalities that would support the alleged severity of the claimant's symptoms. The ALJ pointed to the June 2012 examination where the claimant had normal range of motion and a normal gait; the July 2012 examination where she ambulated with a cane, but could move her

extremities well and had passive range of motion in her hips with no pain; the October 2012 examination where the nurse practitioner encouraged the claimant to exercise three time a day; and the December 2012 visit where the claimant could move her extremities well. (R. 17).

The ALJ also noted that the claimant had a lapse of treatment from December 2012 to May 2013, and that, although the claimant used a cane during her July 2013 orthopedic visit, no doctor had prescribed her a cane. To support her findings that the claimant's symptoms were not as limiting as she alleged, the ALJ pointed to the facts that the claimant used a cane without a doctor's prescriptions and with normal findings in her lower extremities; only intermittently takes her medications; has declined steroid injections; does not take over-the-counter medications; and could walk around the park but stopped even though the objective evidence does not show a decline in her condition. The ALJ acknowledged that the claimant could not continue physical therapy because of her finances and transportation, but stated that both the claimant and her husband can drive and that she was declined charity care because of her family's resources. The ALJ also found that the objective evidence and physical examination findings do not support that the claimant has such severe limitations in her daily activities.

The ALJ found that, given her residual functional capacity, the claimant could perform her past relevant work as a bus attendant, sewing machine operator, sales clerk, and daycare worker. The ALJ also noted that the vocation expert testified that the claimant could also perform other jobs at the light exertion level even if her residual functional capacity included the need to alternate between sitting and standing every forty-five minutes to one hour, while staying on task.

Therefore, the ALJ concluded that the claimant was not disabled as defined in the Social Security Act.

## VI. DISCUSSION

The claimant argues that the ALJ erred in evaluating her allegations of the limiting effects of her symptoms under the pain standard because substantial evidence does not support his findings.  The court agrees and finds that substantial evidence does not support the ALJ's findings regarding the claimant's use of a cane and her ability to *frequently* balance, stoop, kneel, crouch, crawl, and climb stairs.

The pain standard applies when a claimant attempts to establish disability through her own testimony of pain or other subjective symptoms. *Holt v. Sullivan*, 921 F.2d 1219, 1223 (11th Cir. 1991). "The pain standard requires (1) evidence of an underlying medical condition and *either* (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition *or* (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain." *Id*. (emphasis added).

A claimant's subjective testimony supported by medical evidence that satisfies the pain standard is itself sufficient to support a finding of disability. *Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995).  In applying the pain standard, if the ALJ decides not to credit a claimant's subjective testimony of pain, he must discredit it explicitly and articulate his reasons for doing so. *Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991).  Substantial evidence must support the ALJ's findings regarding the limiting effects of the claimant's symptoms.  *Hale v. Bowen*, 831 F.2d 1007, 1012 (11th Cir. 1987).

18

In the present case, the ALJ found that the claimant had medically determinable impairments that could "reasonably be expected to cause [her] alleged symptoms."  Yet, the ALJ found that the claimant's "statements concerning the intensity, persistence[,] and limiting effects of her symptoms are not entirely credible. . . ."  (R. 16).   However, substantial evidence does not support the ALJ's reasons for discrediting the claimant's statements regarding the use of her cane and the ALJ's residual functional capacity finding that the claimant can frequently balance, stoop, kneel, crouch, crawl, and climb stairs.

The claimant testified at the hearing that "Dr. Bratton" prescribed her cane, and she also indicated in her Function Report in July 2012 that a doctor prescribed the cane that she used daily.  (R. 33, 191-195).  Although the court reporter at the hearing spelled the name "Dr. Bratton [phonetic]," the logical conclusion is that the claimant meant "Dr. Broughton" who treated her in June 2012.  *See* (R. 33).

Despite the claimant's testimony at the hearing, the ALJ disregarded the claimant's statements that Dr. Broughton prescribed the cane based solely on the fact that the record contained no actual, written doctor's prescription for a cane.  Social Security Regulation 96-9p states that a hand-held assistive device is *medically required* where medical documentation "establish[es] the need for a hand-held device to aid in walking or standing, and describe[es] the circumstances for which it is needed."  The ALJ must "always consider the particular facts of a case" when determining the need for a hand-held device.  SSR 96-9p, 1996 WL 374185, *7 (1996).  Notably absent from this standard is any requirement for a "prescription."

Even though the record does not contain an actual "prescription" for a cane from Dr. Broughton, the record supports the claimant's testimony that Dr. Broughton prescribed the cane for her.  Dr. Broughton found during his June 2012 examination of the claimant that she had tenderness on palpation in her joints; "mild stiffness" at times; tenderness in her neck with manipulation; tenderness with bending; and "LUMBAR SPINE SEVERE DJD."  Dr. Broughton told the claimant to avoid heavy lifting, driving, and operating heavy machinery.  These findings and limitations on Dr. Broughton's physical examination of the claimant support her statement that Dr. Broughton prescribed her a cane and could support that medical documentation exists that Dr. Broughton prescribed the cane for the claimant.

Moreover, the claimant showed up for her appointment with Dr. Bell a month later in July 2012, ambulating with a cane and stating that Dr. Broughton told her during that June visit that her discs were "separating" and that she has "arthritis in [her] spine" and a "high case of inflammation."  The court also notes that, although the record does not reflect the claimant's use of a cane to ambulate at *every* doctor's visit after June 2012, many of the visits do reflect her use of a cane. Also, the physical therapist did not discourage the claimant from using a cane to ambulate because it was not necessary, but instead instructed her on the proper way to use the cane in July 2013.

If Dr. Broughton told the claimant to use a cane to ambulate in June 2012 and believed the claimant's use of a cane was medically necessary given his physical examination of her on that date, the claimant's use of a cane during the July 2012 visit with Dr. Bell is credible contrary to the ALJ's finding that the claimant took it upon herself to use a cane unnecessarily.  The ALJ simply disregarded the claimant's statement

about Dr. Broughton telling her to use a cane based on the lack of a written prescription for one in the record. Yet, the ALJ had no other evidence in the record from a doctor to show that a cane was not medically necessary or to support the ALJ's finding that she had the ability to *frequently* balance, stoop, kneel, crouch, crawl, and climb stairs given her medical impairments.

Instead of disregarding the claimant's statements about Dr. Broughton prescribing the cane because no written prescription for one was in the record, the ALJ should have ordered a consultative examination to ascertain whether the claimant's use of cane was medically required. An ALJ has a duty to fully and fairly develop the record. *See Lucas v. Sullivan*, 918 F.2d 1567, 1573 (11th Cir. 1990). The court notes that the record not only contains no consulting physician's examination of her ability to ambulate with or without a cane, but the record contains no opinions from any doctor regarding the *exertional or non-exertional limitations* of the claimant given her underlying medical impairments.

Moreover, in the alternative and given the claimant's testimony, the ALJ should have contacted Dr. Broughton and asked him whether the claimant's use of a cane to ambulate was medically necessary. The court recognizes that the ALJ is not *obligated* to re-contact a physician if she finds inconsistencies within the record. S*ee* 20 C.F.R. § 404.1520b(c)(1). However, the court notes that the ALJ obtained no consulting examinations of the claimant to support his finding that the claimant could *frequently* balance, stoop, kneel, crouch, crawl, and climb stairs. *But see Johnson v. Astrue*, No. 5:11-cv-1666-KOB, 2012 WL 4339507 *12-13 (11th Cir. 2012) (finding that the ALJ properly considered the claimant's subjective testimony regarding the reliance on a cane

and did not err in refusing to re-contact the treating physician where the claimant testified *no* physician prescribed the cane and a consultative examination specifically noted that she could move around the room without an assistive device).  If Dr. Broughton believed that the claimant's use of a cane was necessary, the ALJ's finding that she can *frequently* perform the non-exertional limitations listed above could not stand.  Therefore, in this instance and given these specific facts, the ALJ's complete disregard for the claimant's testimony regarding Dr. Broughton's prescription of her cane was error.  The court finds that substantial evidence does not support the ALJ's finding that the claimant could *frequently* balance, stoop, kneel, crouch, crawl, and climb stairs.

The ALJ also found that the objective evidence in the record did not support the claimant's allegations regarding the limiting effects of her pain. The court disagrees specifically as his finding relates to the claimant's ability to frequently balance, stoop, kneel, crouch, crawl, and climb stairs.   The ALJ found that  the claimant's left greater trochanteric bursitis was a severe impairment, but pointed to MRI's and x-rays of the claimant's hips and knees that showed mostly negative results to discredit the claimant's statements that she cannot squat, bend, kneel, or climb stairs because of her pain.

However, the June 2012 x-ray of her left hip showed sacroilitis and a slight widening of the symphysis in her hips; the July 2012 MRI of her hips revealed early stages of degenerative disc disease and a "neural foraminal compromise" of the lower two levels; the July 2013 x-ray revealed a worsening of her hips in that it showed mild superior joint space narrowing; and the July 2013 x-ray of her left knee showed "early degenerative changes of the medial compartment and patellofemoral joint" for which the doctor recommended steroid injections.  These objectives findings do not reflect someone

who can *frequently* balance, stoop, kneel, crouch, crawl, and climb stairs, but instead support her statements about her difficulty and pain in moving her hips, back, and knees in these positions.

The ALJ also found that the claimant's allegations of the limiting effects of her pain were inconsistent with the doctor's physical examinations that showed she had a full range of motion during several doctor's visits.  As the claimant stated, her pain is often constant, but does come and go as she has good and bad days.  Having a full range of motion in her hips, knees, and back on occasions does not negate the fact that she has medical determinable conditions that could limit her ability to *frequently* balance, stoop, kneel, crouch, crawl, and climb stairs.  The physical therapist acknowledged the claimant's "lower extremity weakness" in September 2010 and in July 2013, and Dr. Routh ordered an additional MRI of her left knee in August 2013 because of her worsening knee pain and mechanical instability."  Although the ALJ pointed out that the claimant asked Dr. Routh for a knee brace, as an orthopedic specialist, he would have declined her request had he found a knee brace completely unnecessary.  Instead, Dr. Routh gave her a knee brace and ordered an additional MRI to evaluate the claimant's alleged worsening of her knee.

The court is also concerned about the ALJ discrediting of the claimant's subjective testimony on the basis that she did not regularly take her medications.  The claimant testified that she could not afford her medications and had to "spread them out" so she would have something to take.  On remand, the ALJ should inquire further into the claimant's ability to afford her medications before discrediting her need for them.  The ALJ merely stated that the claimant was declined charity care because of her "family's

resources," but did not explain how her husband's meager disability income negates the fact that she could not afford her medications, especially given that she receives food stamps because of her financial situation.

The ALJ also indicated that instructions for the claimant to exercise meant that her pain was not as limiting as she stated. However, the ability to perform limited exercises does not mean that the claimant can *frequently* balance, stoop, kneel, crouch, crawl, and climb stairs. Moreover, the claimant stated that she walked around the park but had to stop around June of 2013 because her pain worsened. The ALJ said that the claimant's condition had not worsened to justify the claimant's statement that she had to stop walking in the park in 2013, but the record does reflect that she complained that her pain had increased in her knee and that she had abnormal gaits after her July 2013 examination by Dr. Routh. Moreover, the claimant did state in her Function Report in July 2012 that she had to stop and rest for about ten minutes after walking about forty to fifty feet and that she used her cane "daily." Even if the claimant could walk around the park for exercise in 2013 with these limitations, that fact does not support that she can *frequently* balance, stoop, kneel, crouch, crawl, and climb stairs.

Moreover, even though the ALJ in his opinion noted that jobs existed in significant numbers for the claimant even with the sit/stand option, that finding does not affect this court's decision. The ALJ's residual functional capacity still contained the finding that the claimant could *frequently* perform those listed non-exertional activities.

The court finds that substantial evidence does not support the ALJ's finding regarding the claimant's use of a cane and her ability to *frequently* balance, stoop, kneel, crouch, crawl, and climb stairs.

24

VII. CONCLUSION

For the reasons as stated, this court concludes that the decision of the Commissioner is due to be REVERSED and REMANDED to the Commissioner for reconsideration.

The court will enter a separate Order in accordance with the Memorandum Opinion.

DONE and ORDERED this 20th day of March, 2017.

**KARON OWEN BOWDRE**
CHIEF UNITED STATES DISTRICT
JUDGE